Good morning. May it please the court. My name is Eitan Janich. I'm representing Shelly Jones in this appeal. Because Jones has already been found to be disabled beginning July 27, 2009, based on an application she filed subsequent to the case here, remaining at issue is only the time period from January 1, 2007 through July 26, 2009. Just as an explanatory note, although there is significant evidence of impairment in 2005 and 2006, her alleged onset date was amended at her hearing because in 2006 she was doing caregiver work for a former employer and she earned almost at the SGA level that year. And so that's why the amendment of January 1, 2007. She has had essentially no earnings since January 2, 2007. I also wanted as an introductory note to apologize. I submitted a Rule 20J letter last night. Hopefully you've gotten it already, so I brought copies. I made copies and didn't bring them. But copies of the letter? Yeah. Okay, because I made copies of the regulations to the extent that you need to refer to them. But I do have to say that it doesn't really change the analysis here because That was sort of my reaction after looking at them. Yes, all the ruling does is it explains how an ALJ is supposed to handle these cases, but that was how they were supposed to handle it at that time as well. And in any event, we can't expect the ALJ to comply with a ruling that hadn't existed at the time of this decision. But I thought that was useful, that you should have it helpful in the analysis of a fibromyalgia case. Now I want to focus on the main error in this ALJ's decision. It involves his rejection of the opinion of Ms. Jones' treating physician. Now she had two treating physicians, both named Duber. In my brief, I refer to him as George Duber as Dr. Duber and Shelly Duber as Shelly Duber. And I've seen the name spelled different. Are they husband and wife or are they just very similar sounding names? No, I believe they're husband and wife because they practice in the same practice. So George and Shelly. George and Shelly. Okay. I know, and it helped that the claimant here is also Shelly. And it's spelled the same way, the last name, because it has been spelled differently. D-E-U-B-R or D-U-E-B-E-R? Did I mess it up somewhere? I don't know if you did. I think everybody did. Right. It's entirely possible, but I believe it's D-U-E. Let's just go with George and Shelly. We'll go George and Shelly. Well, anyway, George was, I don't want to say, they both treated her. So they were both treating physicians. George Duber administered a bunch of trigger point injections. Now, what's interesting about this case, the ALJ found that the only severe impairment that Ms. Jones had was fibromyalgia, which is not correct. Now, it doesn't, this is not a step two denial, and so it doesn't, it really goes to the analysis at the residual, at later stages in the analysis. But in fact, she had been diagnosed with a number of other impairments and treated for them because ordinarily, I don't know how many fibromyalgia cases you've seen recently. I've seen a number of them, and you don't usually see a lot of trigger point injections. There's not a whole lot they can do. They try medication. There's not much you can do for fibromyalgia. Is there any dispute here with the commissioner over whether she suffers from fibromyalgia? Well, no. See, that's what's interesting is the ALJ found that she had fibromyalgia. There's two diagnoses from two, two rheumatologists diagnosed her with it. Her treating physicians diagnosed her with it. So the ALJ found she had the severe impairment of fibromyalgia. He just found it didn't really cause the kind of limitations she described, and so the problem really in the ALJ's analysis goes to his analysis, his rejection of her testimony about her limitations, his rejection of the doctor's opinions about her limitations. Now, what's interesting here, because there's, in July of 2007, Dr. Duber hand-wrote a letter in which he was responding to questions, and he basically said that because she has these flare-ups of fibromyalgia, when she has those, she can't work. She's really very much disabled, and there were times where she'd show up at the doctor's office in a wheelchair. It would be that bad for her. And he also listed it wasn't just the fibromyalgia. It was the other impairments as well. So in his opinion, if she were to even try to work, she would miss at least three or four days a month, because she gets these flare-ups. The ALJ rejected that opinion. Now, none of the ALJ's reasons are even legitimate, but because the opinion from Dr. Duber was uncontradicted, the ALJ actually had to say convincing reasons. They weren't even legitimate, and I discussed this in my brief. What makes it interesting is that the evidence that the ALJ instead gave great weight to was an assessment form that was completed by a non-physician, a non-examining non-physician, and it was completed in December 2006. It was based on no evidence at all since the alleged onset date. So she reviewed no evidence since the onset date. Now, this form that was completed by a non-physician was then essentially approved, you know, it was affirmed by an actual physician three months later. But he made no comment whatsoever on any evidence since the date of the alleged onset date. Can I ask you to go back, though, to the ALJ's rejection of the treating physician's opinion here? You said you don't think that the ALJ gave even legitimate reasons, and just maybe you can go through that a little bit for me. I thought the ALJ did point to, I don't know if it was inconsistencies or just a lack of support in the treating physician's notes and the medical history. So maybe you can just address that. I'd be happy to. Well, for one thing, he said yes. First of all, he said there was a lack of objective findings. Now, what's interesting is with fibromyalgia, there aren't generally a lot of objective findings. What you generally got are trigger points, and she had the trigger points. Now, one of the reasons was the lack of treatment. He administered trigger point injections numerous times to her, and the ALJ doesn't even mention that, doesn't acknowledge the level of treatment he had been providing to her. The other thing, there were some other reasons were clearly, even the court below found that they were improper. Stating that, well, I'm giving more weight to the state agency physicians, he thought they were physicians when it was really only one physician, giving more weight to them because they're objective. In other words, her treating physician was not an objective observer, objective reporter, and there was no basis for that. He also stated that it was inconsistent with her activities. That's completely ridiculous. Her activities were so limited here, and even the form that was cited by the ALJ where he listed activities, he disregarded every mention, everything she said, everything she wrote in that form that showed how she was limited, he disregarded it all, didn't mention it. And so, none of the reasons, that's why I'm saying none of the reasons were even legitimate, but the reasons had to be convincing here. Well, he did. I'm looking at page five of his report. I think it's ER 17 on the file stamp copy I have. He does say that he reviewed the treatment records of the doctor, and he notes, I guess to support his conclusion that she was exaggerating her lack of compliance with medical advice as to what she should do to alleviate some of these symptoms. Okay. The difference there, there's, if a person is not complying with medical treatment that can cure their impairment, that's a legitimate basis to discredit the claimant, and potentially to discredit a doctor, I suppose, as well. But that is not present here. All that we have is, for example, once again, the ALJ points to one note where he's recommending that she do dietary measures that he thought would help, and she wasn't at the time. She was noncompliant. Why? She was so messed up at that time that she couldn't. She was dysfunctional. Later, there's other notes where he discussed that she was going to be doing the dietary things he recommended. The ALJ doesn't mention those notes. It's a selective analysis of the evidence, and I cite those in my brief. But there's no, the other thing is the ALJ does not, there's no evidence that had she complied with dietary recommendations, it would have cured her fibromyalgia. It may have reduced her symptoms, but also she ultimately did comply with it. You know, she continued to be impaired. So it wasn't some, and the other thing is that the ALJ makes it sound like she wasn't getting medical treatment. And the number of trigger point injections in this file, none of them were, were not addressed by the ALJ, and I list them on page 35, 34 and 35 of my brief. I mean, there's just so much treatment here. The ALJ didn't acknowledge that it was done. Maybe you could also address the adverse credibility determination. Well, that, yes, this dovetails into that. The ALJ's reasons for rejecting her credibility were not convincing. None of them were convincing, and once again, it was a matter of a focus, a selective focus on facts that supported the ALJ's decision, as opposed to actually considering all of the evidence that was in front of them and discussing it. The ALJ did, I'll say, a very good job of not mentioning anything that supported her case. So. Well, but specifically with regard to Judge Watford's question, the ALJ, I'm looking at page 6 of the report, ER 18. He does have a full paragraph where he discusses her activities and then concludes that her activity level conflicts with a claim of total disability. I mean, that's a pretty articulate listing of reasons, is it not? Well, first of all, the activities that he's citing to are from a disability report she completed prior to her amended alleged onset date. Well, November, okay, November 2006 function report. That's right. Her alleged onset. And you said the amended onset date is now what, 2007? January 2007. December 2006, she was still working part-time as a caregiver, and she was functional when she wasn't having the flare-ups. So is your argument here that this could all be true a month or two before, but then as of January 2007 she's totally disabled? No, it's actually more complex than that, because even if you look at the November 2006 at what she, her disability report, the ALJ only mentioned parts of that report that make it sound like she's doing pretty well and doesn't mention any of the parts about the flare-ups and how badly she's doing at other times. So even in November 2006. Counsel, the problem I'm having is that's a pretty short period of time to just totally disregard the evidence concerning the extent of her activities. I mean, we have to look at the record as a whole and determine whether substantial evidence supports the finding, and we require basically reasons, and those reasons look pretty plausible on their face. Well, then you just, as you just stated, you have to look at the evidence as a whole, as does the ALJ. Sure. And that's what I ask you to do, read that report, these sites. But isn't the crux of your argument that the ALJ did not adequately articulate the reasons why he discredited George and Shelley's reports? Yes, there's, that's the crux of the, that's the biggest error. But in addition, part of that error, part of his reason for rejecting them was based on her credibility. He said, well, she's not credible. But his evidence he cites in support of his credibility finding doesn't even, doesn't support it. Because if you read the entire, he cherry-picked statements from a report and ignored, completely disregarded all the statements in that report that show that she was actually, she wasn't bedridden, but when she was having flare-ups, she was. And so that was the thing. He did, he, just the fact that she was, could do some activities when she was functional is, it was not a valid reason to just completely not even mention anything in that report that shows how much worse she was actually doing. And it's also before the election onset date. But that's. Do you want to save some time for rebuttal? I would like to, thank you. Okay, very good. Let's hear from the Commissioner. Good morning, Your Honors. May it please the Court. I am Summer Stinson, and I represent the Commissioner. This Court should affirm the ALJ because Shelly Jones is able to perform her past work. Additionally, this Court should uphold the ALJ's alternative determination that she is disabled under the medical vocational guidelines. The ALJ's decision is supported by substantial evidence, and this Court should affirm it. At the time of the hearing, Ms. Jones was a 40-year-old who had a high school education with police dispatch training. When determining her credibility, the ALJ relied upon the inconsistency between her activities and her statements regarding her limitations. If you could just stop right there and address Counsel's claim that the ALJ actually just cherry-picked, you know, various items of evidence here and there to support his conclusion, when in fact if you look at the entire record, her account of her limitations is completely credible. And the ALJ did thoroughly discuss what she claimed her limitations were, and he found that those were inconsistent. An ALJ must only explain why significant probative evidence has been rejected. The ALJ is not under any obligation to talk about every single piece of evidence, and so the probative evidence was discussed here. The fact that she was claiming that she had to elevate her legs at all times, spent most of the day in the lounger, and could not be on her legs for any length of time, the ALJ discussed that. He just found those inconsistent with her activities, which included that she did yard work. She did housework. She rode horses. She cared for her 8-year-old son. She prepared simple meals. She did laundry. She reported in November 2006 that she rode horses for once a month for 20 minutes at a time. And at the hearing in April 2009, she reported that she had ridden a horse six months prior. The ALJ also properly relied on Ms. Jones' unexplained failure to follow her prescribed courses of treatment. Here, Dr. George Duber instructed Ms. Jones to exercise for 60 minutes a day. Exercise, and simple exercise, has been found to help a person with fibromyalgia. However, Ms. Jones reported to Dr. George Duber that she was sedentary, and this is a quote, she was not presently interested in changing her activity level. Dr. George Duber also strongly advised her to quit smoking, and she replied, again, a quote, that she was not willing to quit smoking. It wasn't like she had tried and wasn't able. She said she was not willing to try that. And so you're saying that if she had quit smoking, she would have been perfectly able to work. I'm saying that if she had quit smoking, that possibly could have helped her circulatory system or her blood pressure. Certainly, exercise has been found to help fibromyalgia. And so those were two things that her doctor recommended time and time again. And it's not that she said she was having trouble with them. She said she wasn't interested in even trying these things. She wasn't interested in changing her activity level. She wasn't interested in trying to quit smoking. And we understand that there is a difference between somebody trying and not being able to, or just not wanting to try at all. That is failing to follow a prescribed course of treatment. But I think what I'm struggling with is that doesn't necessarily discredit the flare-up argument that there could still be periods of time where her symptoms were so severe that she simply couldn't work. And the Ninth Circuit has ruled that there is, even if a claimant makes qualified statements as to what they're able to do, that even that, even the fact that they're able to do these things sometimes is enough to find them. When she says she has to stay in bed all the time, which is what she was testifying in, or actually in a lounger, she said she couldn't stay even in a bed. And that's what she testified in 2009. And yet she had ridden a horse six months prior. I mean, that's, even if you're just being led around on a horse, that's a pretty strenuous activity to even get up on a horse. And those are inconsistent. And the ALJ found that they were inconsistent. And the standard there is that even though her now alternative interpretation of the evidence, that's insufficient to justify overturning the ALJ's decision. I don't see the inconsistency, though. I'm saying that I have these flare-ups with sufficient regularity that it would preclude me from holding gainful employment. When I don't have these flare-ups, sure, I can do very limited activities, as she testifies to. She was being quite candidate-team to me and saying, when I don't have these flare-ups, I can do certain things, and here they are. But when I do have these flare-ups, I can't do anything. And they happen with enough regularity that it's going to preclude me from working. She testified that these were every day. And she even gave a statement of a typical day, where she says she hardly got off her lounger for more than 10 minutes at a time in a typical day. So it's not that she was testifying that she only had these flare-ups every so often. She was testifying that this was her everyday life. And so if that was her everyday life, then how could she also be riding horses, albeit not often, but still that's a very strenuous activity. Or even sitting on a lawnmower or mowing the lawn and doing yard work is a strenuous activity for somebody who says that they spend every day in a lounger with a heating pad under them. So are you saying that that explains the ALJ's finding, I guess it is, on page 5, that he finds that her medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, her statements concerning the intensity, persistence, and limiting effect of these symptoms are not credible to the extent that they're inconsistent with the residual functional capacity assessment. Yes, he did not find her completely not credible. He found her not credible to the extent that she could perform light work, that she could do one. So basically she was exaggerating the intensity and the frequency. Yes, exaggeration is not the... I know, it's not a term of art, it's my term. Yes, yes. Pejorative term. Yes. But I'm not a doctor, so... Right, and he's not saying she's not in pain or doesn't have flare-ups, but it's inconsistent to say you are in a lounger all day, you can't even sleep in a bed, you're that uncomfortable, you can't be in a bed for the last three years. Which actually she had reported she had been in a bed within the last three years. That's inconsistent with somebody who can get up on a horse and sit on a horse and participate in that activity, albeit only for 20 minutes. That's still a physical activity that's inconsistent. But if she has these flare-ups, let's say, maybe it's not daily, but even if she had them four times a month, wouldn't that be enough to prevent her from working a full-time job? But she says she had these flare-ups all the time, and so when looking at her credibility, does she really have these flare-ups all the time? All the time or at all? I mean, it seems to me that she could have the flare-ups even if it's not daily and still be incapable of maintaining a regular work routine. But she said that she had the flare-ups more often than that. She reported on a typical day she hardly got out of her lounger. So it's not that she was reporting. I think at some point she reported, oh, I just have flare-ups every so often. But she was reporting that she also could not even get out of her lounger. She said, get out of my lounger for 10 minutes to put on a pizza, then I get back into my lounger. And so she was saying that she was not able to get out of her lounger, yet she had been riding a horse. I'm still having a hard time. I mean, Dr. George Duber, in his July 27, 2007 opinion, basically says based on her symptoms, she can't engage in sedentary light or medium work on a regular and sustained basis. And I'm still trying to understand how that is necessarily inconsistent with the extent of the activities on her good days. And not only was, again, of course, for credibility, we're not just relying upon her activities, but also on her failure to comply with her doctor's prescribed treatment. The thing about Dr. George Duber is when you look at his notes, there's nothing where he's testing how much she can. He never tests how long could she walk, how much activity could she handle. He basically just takes her word for it and treats her symptoms. And so for him then to give a response to a four-question questionnaire saying she could not work, that's where there's definitely evidence in there that she had fibromyalgia, but there wasn't any evidence that would support residual functional capacity that was more restrictive than light, which is what Dr. Turner and the ALJ determined. I'm sorry. I'm hearing that part of your argument is that she failed to follow the prescribed treatment. But then I'm also hearing you critiquing or concerned about the horseback riding and the riding on the lawnmower. How do I put those two together? Well, those two things are both separate, and either one is independently a reason to find somebody not credible. So we have more than one reason. The ALJ is only obligated to give one legally sufficient reason, and here the ALJ gave three legally sufficient reasons, which were that it was contradicted by Dr. George Duber's, contradicted by the medical opinions, that she failed to follow treatment, and that her activities were inconsistent with her level of what she said she could do. I'd like to hear a little bit more of your defense of the ALJ's rejection of the treating physician's opinion, because I tend to agree with counsel that I didn't think, I don't know if the reasons were not legitimate, but they didn't seem very convincing. So I'd like to hear your defense of that. So they weren't supported by his own examination findings. Certainly, again, his examination findings supported fibromyalgia. However, his examination findings did not support that she could not even perform sedentary work. He hadn't done any of those tests where he had determined, you know, how long can she walk before she gets exhausted, how much can, you know, what's her range of motion, how much can she lift. Those types of findings are not in this record. He also, it was so, he responded to a four-item questionnaire, and he just stated he had turned in no notes at that point. He stated summarily that she could not work due to unpredictable pain. Okay. But there are extensive treatment notes, right? Yes. Going back quite a long time. And I don't think the ALJ ever seemed to grapple with the fact that there actually was quite a bit of support for the treating physician's opinion. There's quite a bit of support for the treating physician's opinion that she had fibromyalgia. The extent that he found her to say that she could not perform even sedentary work at all, there is not any support in the record for that in his notes or elsewhere. I mean, isn't part of the problem here the nature of the disease is such that there aren't a lot of objective tests that can be done? I mean, we have the trigger points, which, as I understand it, the physician has to find pain in certain areas, so many areas of the body, and if you get whatever the number is, 10 out of 14 or whatever, then that supports the diagnosis. But beyond that, as I understand it, it's difficult because there really aren't any medical tests. And the diagnosis is not at issue here. Right. The commissioner did agree she has fibromyalgia. It's to the extent that that restricts her ability to work. So is your argument that Dr. George Duber did not do objective evaluation tests when he saw her, such as doing hand strength tests and what's your range of motion in the examination room? There's nothing in the treatment notes about that? There's nothing that supports it that the ALJ found, correct? Nothing that supports it or nothing in the treatment notes? There's nothing like, you know, he basically took her word for what she was saying. I didn't do any of those kinds of tests. Correct. Okay. So just help me with this. So what's changed such that she's now, she is completely disabled? What changed between the record that we're dealing with and the subsequent? Let me turn to that. I will answer that question. And so what has changed is that she did, she turned, she applied again. We call that a subsequent application. And she applied again and then a different ALJ reviewed that, had a hearing, and issued a determination that she was what we call a subsequent favorable determination. And that, her date of disability was three months after, about 12 weeks roughly after she was found not disabled here. So sometime in what year? This was, okay, so she, the subsequent decision was with an alleged onset date of July 27, 2009. And the case that issued before us here, she was found not disabled on May 5, 2009. Yeah, so what changed? What changed is that the ALJ in that subsequent hearing relied upon a medical, impartial medical examiner, Dr. Johnson, who reviewed the record and testified at the hearing. And then Dr. George Duber also gave a new opinion in April 2011. So the ALJ relied specifically on that. And we have that, we don't have those medical evaluations in this record, but we do have, again, it's not in this record, but counsel has provided the court below with the subsequent favorable determination. And so it is in the record before this court. To go back to Judge Watford's question though, so the subsequent reviewer was Dr. C. Richard Johnson, right? And he was a medical examiner, and he testified at the hearing. So he was under oath and testified. Based on a review of the same record that we have before him? No, because there were updated medical records, including Dr. George Duber put in a new opinion in April of 2011. And what, you're saying that in the interim he did these tests that you're faulting him for not doing before? I don't have his, we do not have before us this record, but he continued to treat her it appears, and he came out with, or applied new things, and then a medical examiner came to the hearing and answered questions. Again, we don't have that before us. Dr. Johnson? Dr. Johnson. Okay. Correct. All right. And from a legal standpoint, what weight, if any, should we give to that subsequent disability finding in this proceeding? That subsequent disability finding does not impact this proceeding or does not affect this proceeding, because she was claiming that she started her disability three months after this ALJ found her to not be disabled. Counsel, if we were to reverse and remand for better articulation by the ALJ of the reasons in support of the determination, would it be on an open record? Would the ALJ then be required to look at the subsequent medical reports and Dr. Johnson's testimony and try and determine whether any of that related back to the first period of disability? I think that would depend on what you, I would argue that Bruton and not Luna. I know that in Luna that was a, I believe, what the court remanded for, remanded the decision back to the commissioner to do that. Here, I would argue that this case is more like Bruton, where there is a three-month gap in between, and therefore the new evidence does not at all apply to three months before. But how can we know? We can't make that determination on this record. Why shouldn't we, if we're inclined to remand, why shouldn't we remand it to the administrative agency and let the administrative agency decide what new evidence, if any, it will consider as part of its effort to more clearly articulate the basis for the ALJ's initial ruling?  I just want to explain that a remand is not warranted simply because a claimant receives an award of benefits on a subsequent claim, as long as the two claims are easily reconcilable on the record before federal court. We submit and argue that they are. But how can we know that? That's the problem I'm having is I don't know what the new evidence consists of. Isn't that the job of the agency in order to determine? The issue is not what the new evidence consists of, but if there is different new medical evidence. That's the standard that was laid out in both Luna and Bruden. But how can we tell that if we don't have that evidence before? Because we do have that a doctor testified at the hearing and relied on an April 2011, which obviously would not, it was not in, he had an opine that by the time the ALJ decided this case that's before us. Yeah, but you're asking us to rule as a matter of law that whatever Dr. C. Richard Johnson said and reviewed may not be considered any earlier than April of 2009. And I don't know how we can do that without knowing what we're talking about. And here the ALJ, and in Luna there was no mention whether it was new medical evidence. Here we do have the fact that there was a new doctor who, a medical examiner who testified at the hearing and also that the ALJ relied on a 2011 report from Dr. Duber. And so here the decision of the subsequent hearing, the subsequent favorable decision specifically tells us that they relied on medical evaluations that had not been before the ALJ in the case that we're discussing. But suppose that some tests were done for the subsequent hearing that confirm objectively what Dr. Duber thought earlier. Why couldn't that be considered as part of the disability determination for the first period? Because if in 2011 Dr. Duber did tests and wrote about those... 2011 or 2009? 2011. I see, okay. I mean... I see, all right. So April 2011? Yes, that's the date of his opinion. Okay. And so if he did tests in 2011, and it sounds like he may very well have, that supported her subsequent favorable decision. Okay. I think I know. Okay. All right, thank you. And I let you go way over. I'm sorry. No, that's all right. I had questions. Thank you, Your Honor. Thank you very much. Mr. Yannick, I think you have a minute or so on rebuttal. I'll do my best. Let me just first point out that page 36 in my brief, I discussed that the ALJ statement about Dr. Duber's opinion being unsupported by objective findings. That statement is false. It's not supported by substantial evidence, and that's a very low standard. Pages 34 and 35 in my brief, I list the objective findings. It's not like there were not objective findings, and these are significant objective findings. Dr. Duber wasn't just making this stuff up. March 16, 2007, she presents in a wheelchair, was unable to stand to be weighed. I'm going to jump forward, though, to February 2008, when Dr. Shelley Duber listed objective findings, such as an antalgic gait, favoring her right lower extremity, acute spasms in her paraspinal muscles, decreased range of motion in her spine, focal tender points. All of this is objective evidence. It's objective findings. But the ALJ said there were no objective findings. It's a false statement. I can't call the ALJ, I'm not supposed to call the ALJ not credible here, but in a lot of ways I think some of his statements are less credible than anything that's attributed to Ms. Jones. Now, the other thing is that regarding any differences between her testimony, well, we do have to understand that her testimony was at a hearing that was held in April of 2009. And the ALJ was looking at a statement she completed in November 2006. So there's some, she was worse in April 2009. The evidence shows that. But still, you can't compare those two things. It's just we're looking at very different time periods. Is this the one, did she appear by videoconference? I believe that the ALJ may have been by video. She was, you know, she was, I don't recall that exactly. He's trying to evaluate a witness by television. Is that what's going on here? Well, I don't think he's so much evaluating, you know, really an ALJ, you can't look at the person and determine whether or not they have an antalgic gait or what pain they're feeling anyway. Credibility here. The question is whether or not his ability to assess her testimony was somehow compromised because she was appearing by video teleconference and not in a live courtroom. You know, I can't recall if this was a video one or not. I've had many cases where. I don't remember either, but we can check it. I've had problems with that where an ALJ says things that I know they couldn't see because they're this big on the video. Judge Gleeson has just pointed out that this was by video. But once again, I think the bigger issue here is that Dr. Duber did not just make this stuff up. He actually had been treating her. He administered trigger point injections repeatedly. A doctor's not going to do that for no reason at all. He's got his patient comes in, he checks her out. He also lists, you know, findings of her December 2006. He found she had antalgic gait, trigger point pain. I mean, this is all supported. I think we understand your point. We can go back and re-read the treatment notes. The only other thing I want to mention, regarding the noncompliance with treatment, I once again just want to point out there was not noncompliance with the treatment regimen she was getting. She was complying with the treatment regimen. She didn't perfectly comply with medical advice, health advice, general health advice. There's no precedent for doctor tells you, you know, you really ought to quit smoking. She really ought to quit smoking, but that has nothing to do with why she's disabled here. This isn't like it was a COPD case where she couldn't breathe and the doctor said, you better quit smoking, and she's like, forget it. Okay. Counsel, you're out of time, and I've let you go over. I appreciate that. Now you're starting to repeat yourself, so I think we'll end it on that. The case just argued is submitted.
judges: Gleason, Tallman, Watford